Welcome to day three of the West Court panel. We've had some interesting and lively cases thus far, and it looks like we have more of the same. Although I give this admonition, it's kind of been in the breach, and that's about when you come to the podium staying in the microphone, despite the fact that I've kind of said it yesterday and the day before we had lawyers kind of back off. We record the proceedings, so for that reason we need to keep your voice up. But more importantly, for us to really hear the answers you're giving, please try to stay in the mic and don't wander. Other than that, you know about the traffic light. If you get that yellow light and you're still on point one and you have any reasonable thought of talking about another point, you might want to shift gears there. And the last point is, one of the primary benefits of this is to answer the questions that the panel has. So even if you have a red light, if one of the judges has a question, we want you to answer it as succinctly as possible, and that will help us a lot. That said, we call the first case Fortune Natural v. United States Department of the Interior, et al. Mr. Roman, is that right? Roman? Roman? Okay. Good morning. May it please the Court, I'm Brian Roman here on behalf of the appellate Fortune Natural Resources Corporation. Here with me today is Matt Oken with the law firm of Oken Adams, LLP. The issues that I want to address today with the Court are standing and mootness. The standard review is the person aggrieved standard. There's more than one way to become a person that is aggrieved by an order. One of the ways it's, I guess, focused on in the briefs is the directly and adversely affected pecuniarily by the order. But that's not the only way that you can be aggrieved and have standing to an order. The other ways that you can have standing to appeal are if the order diminishes your property, if it increases your burdens, or if it impairs your rights. And we believe very clearly today that the order, as it is entered, impairs our rights, increases our burdens, and directly and adversely affects us. The District Court found that we failed to demonstrate standing because it found that our claim was speculative and that we were not directly and adversely affected by the order. The Court reasoned that if the sale and the trust had not been entered, then there would have been no funds available to my client to share with the decommissioning expenses. So the Court reasoned that if I don't have the sale, you get no money. With the sale, you get no money. So the result is the same. Therefore, you're not harmed by the order. I think that is not the proper focus. The focus needs to be on what does the order say and how does it affect the litigant. And in this case, it very clearly affects us. It impairs our rights, as we'll get to in a minute. But what's alarming is the Court did not consider whether or not the order impaired our rights and did not consider whether or not it increased our burdens. So is it your position that you agree with the District Court that you wouldn't give the money either way, but the result of the order has other adverse effects on your client? Is that what you're saying? In a manner of speaking, I disagree with the Court if they're suggesting there was no way for us to share enough funds. If the— So when the Court says you would not have had access to such funds, you believe that's an error? If he means—I'm sorry, I want to make sure I understand the question. If the question is if the sale didn't go through and there was no trust, would we have access to funds? No, we would not have access—there would be no funds. But my point to the Court is there was a way for the Bankruptcy Court to structure the sale and the trust in such a way that the funds were not available solely to the appellee, the interior, but they were available to all of the administrative expense claimants, not just there. So there was a way to structure the sale and structure that order such that we did get money. We could recover and share equally with similarly situated creditors like the appellee. And did you move for that in the Bankruptcy Court? We objected on the basis that we were not being treated fairly and that the— But did you give a specific recommendation or suggestion as to how it could have been structured differently so that you would have had access? I'm not 100 percent sure in the Bankruptcy Court whether or not we actually made a specific recommendation, but that was the general sentiment of our objection was— Well, if you didn't, didn't you waive it? If you haven't pled this before? You can't come up with new facts at this late date. That may be true, but I would feel pretty confident telling the Court that the sentiment of our objection was you're not treating similarly situated creditors the same. You're allowing the appellee to basically have all of the pot of the money and not giving any to any of the other administrative expense claimants. But if you're arguing that a core piece of error was it wasn't structured in a way where you got money, you could have gotten money. Number one, I don't understand why you don't really know the answer to that question or whether you specifically did or not. And number two, I don't understand how you can argue that it was error if the Bankruptcy Court is supposed to infer something that you didn't specifically put to the court as an option. So for the first part, why don't you know precisely whether it was articulated to the Bankruptcy Court or not? I wasn't specifically party to the . . . Well, that's never a good answer here. When you appear on appeal, you embrace everything everybody else did or did not do. It just doesn't work to say you don't know or somebody else did it, particularly when you're the appellant. Yes, Your Honor. So is it in the record somewhere that would answer the question definitively how it was articulated or not? I would have to refer back to the record and provide a supplemental brief answer on that, Your Honor. But the fact that the court went into it to some extent might make one think that you did, in fact, raise it. The court's explaining. So one would think that this was somewhat before the court, perhaps, and we'll have to go back and check. But assuming this was before the court, then you believe you have standing because the money should have been applied equally throughout all the creditors and not just to the interior, right? Yes, Your Honor. That's correct. And that is the sole basis of your standing, or do you have some other basis in a way that you're impaired? We have additional basis, Your Honor, and that's the impairment of our rights. Braniff . . . the Bankruptcy Court correctly identified the tension between the Braniff and his progeny and also Midlandic, and the Bankruptcy Court was under the impression that to resolve those two competing interests, it had to trump Braniff and his progeny and defer to the Midlandic thing, the Midlandic holding. But Braniff requires that you do things through a plan, and through a plan, creditors are entitled to disclosures, adequate testimony to be heard. I'm sorry. I'm having trouble. How is that an argument about impairment? I think that's an argument that the court applied the wrong standard in considering the issue, or are you trying to give additional grounds for impairment, or are you trying to tell us the standard was wrong? The impairment . . . what I'm trying to get to, Your Honor, is the impairment is that the order violated the priority scheme of the Bankruptcy Code, and it impaired our right to be treated equally as a similarly situated creditor with the appellee. That's the impairment. That's the same impairment we've already been talking about, that the funds should have been applied across the creditors, right? Yes, Your Honor. Okay. And then also there's the increased burdens when the order got entered in the way that it got entered. It made it clear that it foreclosed any possibility that my client could share in the funds, meaning now we know with certainty, because of the order, that our burden is going to be increased. We will have to cover ATPs, the debtors, decommissioning costs. Before that, if that order doesn't get entered in that manner, our burden may or may not be increased, depending on . . . So until the final order, you didn't know and you couldn't have done anything to stop it before then. Correct. Reminder, did you move or your client move for the stay? They did not, Your Honor. They did not move for the stay? No, Your Honor. Did anyone move for the stay? I believe Anadarko moved for the stay on a different issue, but not on this particular. And it was denied on a different issue? Yes, Your Honor. Why isn't it precluded because no one moved for a stay, regardless if you have standing? Even if I agree with you on the standing, isn't it fatal to your case about the failure to get the stay? The mootness, the 363M mootness argument, it's not moot if the provision we seek to change is not integral to the sale. And our position is that changing a provision of the trust to treat the creditors equally that are in the same class is not integral to the sale. It's not going to undo the sale. We don't want to undo the sale. We don't want to undo the establishment of the trust. We simply want to change the provisions or mechanisms within the trust that allow the appellee to recover all of the money while the other creditors recover nothing. So the money will be sitting there in the pot and you just want to divide it differently. Yes, Your Honor. So in that regard, we feel like it's analogous to the Supertrail case where the Fifth Circuit held that it wasn't moot because they were—it was basically a fight over the proceeds, not a fight to overturn the sale. And to be clear, we're not trying to overturn the sale. We're not trying to overturn the establishment of the trust. We're simply trying to change the provisions such that it complies with the In this particular case, the appellee wore two hats in this negotiation of its objection to the sale. It was, on one hand, the environmental steward for the oil and gas properties, and then on the other hand, it was an administrative expense claimant. So it used its regulatory powers and leveraged those powers to cut the best economic deal for itself. And neither Midlantic nor the appellee's mission are really concerned with economics. They're concerned with the public health and safety. And this deal was struck to give them total discretion based on the economics of the deal, not on the public health and safety. And therefore, I would argue that Midlantic may not even apply if they're not concerned about the public health and safety of these leases. The government intends to clean up and decommission the leases for which they are liable first. It's not a matter of which leases need to be remediated first because of the public health and safety. It's purely an economic issue to them. Right. But the fact that the government takes the position that they would never have gone along with it had that not gotten that distribution, had they not gotten their disproportionate distribution in the trust, why doesn't that cut against your argument that it doesn't matter what the terms of the sale was? Because I think that's an argument of convenience, Your Honor. I think they truly—that would have been cutting off their nose to spite their face. They would have then, if they did that and unreasonably refused to consent to the sale and left that $44 million with the purchaser, no sale, then they would have been, like Fortune, responsible for all their decommissioning liabilities and obligations. And no one would have been served in that instance. So I don't think it's realistic to say that they would have ultimately torpedoed the sale just because they didn't get total control. But they say that. And how do we decide that at this point? Well, I would say that based on their mission to protect the environment and the court's concern with Midlantic, I think that they ought to strike the best deal they can, and then they shouldn't be concerned with who gets to share in the money. It's all going to decommissioning cost. It's not going to be spent on anything other than that. So why do they care whether or not they get all the money or not? It should be there for everyone, because if this was done in a bankruptcy, creditors have protections, and we should be treated equally. And then an additional point with regard to the mootness in the 363M, that statute is designed primarily to protect good-faith purchasers. And all of the cases that the third party that's objecting to the sale that has consent power. In this case, the purchaser doesn't care how those proceeds are allocated. The debtor doesn't care how those proceeds are allocated. The only person that cares how those proceeds are allocated are the administrative expense claimants, like my client and like the appellee. And again, the allocation is not integral to the sale, because neither the seller nor the purchaser care about it. The debtor was not even involved in the discussions regarding the establishment of the trust or how much would be in the trust or any of those things, and the purchaser, surely once they pony up the money, they no longer care how it gets allocated. So I find it difficult to believe that it's integral to the sale in the sense of 363M, when the seller and the purchaser don't care either, because that money is still going to be used for its intended purpose, which is decommissioning the oil and gas leases. And I'll reserve the rest of my time unless the Court has any further questions. All right. Thank you, sir. All right. We'll hear from the Department. How do you pronounce your last name? Zao. Z-A-O. Zao. All right. Thank you, sir. Good morning, Your Honors. May it please the Court, I'm Victor Zao of the Department of Justice for the United States Department of the Interior. We're here today to address two dispositive questions in this appeal. First, does Fortune have standing to appeal? And second, even if it does have standing, can it continue the appeal despite statutory movements? The panel should affirm the court's dismissal of this case unless it can answer yes to both of these questions. But the only appropriate answer to these questions is no. First, standing. It's clear under the Coho Energy case decided by this Court in 2004 that standing in a bankruptcy is a more rigorous standard than standing, a traditional constitutional standard. As the Court explained in that case, it requires the harm to be fairly traceable to the order that's being challenged, and that the complaint must demonstrate that it is directly and adversely affected pecuniarily by the order of this Court. Earlier today, Appellant's counsel introduced a new standard based on rights being impaired or burdens being increased. That was not raised in the prior briefing, so we have not had a chance to respond to that. But certainly, Zao's standard was not mentioned in the precedent — presidential decisions of this Court. Why don't they have standing? Because the decommissioning cost, I mean, should have been applied to that, and it was in all the prior documents until the very end when the Court decided to let Interior get a different share, which is different than the way bankruptcy normally works, where the creditors have to be all divided up. Why don't they have standing? Because if it would have been applied the way it would have been, then they would have been better off, and being better off, so they are adversely affected. Because even if they don't personally get the funds, the fact that the funds are not being applied to their obligation when they would have been if they had been divided equally, why isn't that standing? Your Honor, your question has a couple of parts, so please allow me to unpack it a little bit. First, this wasn't a case where this money was first provided to the estate and then to be distributed to the creditors. This was a privately negotiated trust between the creditor and the purchaser in this bankruptcy sale. So because we act as environmental regulators with the purpose of safeguarding the offshore drilling environment, we wanted to create an environment where once companies are completed with their drilling operations, they appropriately plug the wells and abandon the infrastructure. So because we have these regulations in place, we wanted to make sure that when the purchaser takes all of these viable assets out of the debtor's estate, that they leave behind some funding so that we can decommission those estates that were left behind, that were not producing, that needed to be abandoned. So that's why when the purchaser prevailed at the auction, we approached the purchaser and said, hey, we have to set up a vehicle pursuant to which we can protect the environment, and that's how this $44 million trust came to be. The reason that there is no standing is the focus isn't on whether or not this trust should have been provided to all of the creditors. The question is, what were the circumstances facing Fortune before the sale order, and what were the circumstances facing Fortune after the entry of the order? Before the entry or absent the entry of the sale order, I think Appellant's counsel conceded that there would be no funds for decommissioning, period. If the United States were not — if the sale hadn't gone through on the terms that we agreed to, the record is fairly clear, and the bankruptcy — But the sale could have gone through, and then the funds allocated equitably. No, I don't believe that's what the record reflects, because — Why not? We had the right of consent pursuant to the Outer Continental Lands Shelf Act, or OCSLA, and the Assignment of Contracts Act, which provides us the right of consent. So the government would have cut off its nose despite its face, as the opposing counsel just argued, that you wouldn't have done? No, the $44 million trust was produced — was negotiated over weeks, several weeks. Both sides were well-represented by counsel and financial advisors, and we put together — we created a final trust product that was acceptable to both sides. Certainly there's some give and take in that process, but the fact that we must have discretion was a non-negotiable aspect of the deal, and here's why it was non-negotiable. Because out of the leases that were left in the estate, there were about $12 million or so in terms of obligations that were associated with leases on which there was no viable party which would actually perform the decommissioning. So if we didn't have the discretion to first apply the funds to those leases, the United States would then have to go to Congress to obtain further authorization, and that would potentially impact additional taxpayers. And that wasn't an outcome that was acceptable to the United States. So is the whole reason that this is not normal because you're the government and you get to do something special that any other person in the bankruptcy wouldn't — that may be the answer, but is that the whole reason this is not being treated like ordinary bankruptcy proceeds? Sure, we do have the right — Is that the whole reason this isn't the normal thing? That is one of the reasons, sure. We have the right of consent provided by United States statutes. We are protected by the law. Do you think that this is an equitable thing, though? How is it appropriate for the person that's liable for the naked interest to have the claim reimbursed in full while similarly situated predecessor liable interest and jointly liable interest are left with no method of reimbursement? How is that an equitable result in this bankruptcy? It's equitable on several levels. First, it's equitable because we are not getting any of the trust money. What we're doing with the $44 million is that we're putting it in a trust and we're setting up a decommissioning — we're appointing a decommissioning administrator who will go out and find companies who will perform these decommissioning obligations. And when they are performed, we will then reimburse those entities for the amounts that they spend in decommissioning. So we're not getting a cent out of this $44 million. And it's an equitable result because it's, in our judgment, the best way to protect the environment. So you have these obligations, these $12 million worth of obligations on which there's no other entities are liable. And then you have, I think, more than $40 million in obligations on which there are only predecessors liable. So we have to have a way to, one, incentivize those predecessors to perform decommissioning and, two, to perform the decommissioning that no one is responsible for. We feel, in our judgment, and I think objectively, that is the best way to protect the environment. When you have means to get the naked liabilities performed and the means to convince predecessors and to incentivize them to perform as well without having to go back to Congress and potentially further burdening the taxpayer for additional funds, when here we have a purchaser who, because we're protected by the law, because we have these consent rights, we're convinced to apply $44 million out of their own pocket to cover these costs. So that's why it's inequitable. You're not getting a cent. You mean to walk away with. You don't mean that you're not getting a cent that you can cover things that otherwise you'd have to go to Congress to cover. I mean, you are getting a cent. You're not personal. I mean, the government's not making money, but you're covering liabilities that otherwise would not be paid that the government would have to assume. Your Honor, you're absolutely correct. We are the decommissioner of last resort, and because of that, if there is decommissioning on which no other party is liable, we have to because we have to do that as the steward of our continental shelf. So when there is decommissioning that has to be done, we have to do it, and when we have to do it, we don't like to. There are already amounts that are budgeted in every agency's budget to do these types of things. When there are unexpected expenses, we have to go to Congress to get additional money, and that burden will fall on somebody. So it's not your position that they waited too long or that they waived or something. I mean, you may be arguing that they should, but your position is that they would never have a right to complain. Absolutely. So it doesn't matter whether they timely raised it with the bankruptcy court. It doesn't matter because your interest trumps theirs every day of the week because you're the government, right? Yes. That's our obligation to the people to make sure that the amounts that we've adequately budgeted is sufficient to decommission and protect the safety of the outer continental shelf. That is our position. So, you know, I think Your Honors asked some questions about whether this was adequately raised at the bankruptcy court level. Appellant did not ever compose an alternative arrangement, which would have been acceptable to us and certainly wouldn't have been acceptable to the bankruptcy court either. So while they had objected after the bankruptcy court entered the interim order, they didn't propose an alternative solution. If they didn't realize that it was going to be like this until that time, when did that obligation to think of something else come about, the interim order stage? Because they thought that they were going to get their fair share. Maybe it was naive, but they thought that until the final order came out, I think. Well, Your Honor, I think the briefs will show that they thought that because of, I think, an erroneous legal interpretation. Throughout every proposed order that was filed with the bankruptcy court, the terminology that was used was that the trust will be used for, quote, any or all, end quote, decommissioning obligations. So the appellant, I think, interpreted any or all to require the funds to be used to cover all federal leases, and that simply isn't what any or all means based on, you know, what it means in the dictionary. Any or means one or some indiscriminately. Without an or, it's a disjunctive. So we can use it for any leases or we can use it for all the leases. I think any or all conveys- It's totally your discretion. It's up to our discretion. That's the only way we would have withdrawn. We had lodged a consent. We had lodged an objection. But they didn't know that until they saw the final thing. So I'm trying to think if they were late. I don't know that they were late. Do you think they were late? Well- If they didn't realize it until they saw the final thing that y'all were going to interpret it that way, that's when they became aware that their rights, to the extent they have rights, were being impeded. Well, I think, as a threshold matter, I think the word any or all is fairly clear. So because that was in all of the proposed orders, they had noticed that we had discretion from the very start. To the extent that there was any misinterpretation, I think that's a result of an erroneous legal judgment and not something that we can blame on drafting. So, secondly, I think the fact that we were going to use the funds in our discretion was something that was discussed at the interim sale hearing. A significant amount of time was spent at the two-day hearing discussing the merits of the trust, why it was needed, and as appellant counsel indicated, that was the most, I think, difficult aspect of the opinion for the bankruptcy court judge. And at his remarks when he delivered his oral ruling, he spent the most amount of time trying to reconcile whether the $44 million trust was appropriate under the bankruptcy code. But that isn't the question that's facing the court here today. The question facing the court today isn't whether or not the bankruptcy court could have done that. The question is, how would Fortune have been impacted absent the trust? And as you heard as counsel concede in his argument, there would have been no funding absent the sale. That's the end of it. That's, you know, I think that says about as much as I need to say about standing. So I want to get to mootness, unless your Honor has additional questions about standing. Mootness safeguards the finality of a bankruptcy sale, and Shields, and this is one of the reasons why mootness is important, Shields' third parties rely on a bankruptcy order from litigation that may drag on incontinuously. So the United States relied on the finality of the sale order. We had launched an objection because we felt the sale did not protect the environment. We negotiated with the purchasers, and we obtained this trust. Because we had this trust, and because the trust gave us the discretion to apply the funds the way we wanted to, we withdrew our objection to sale, and we let the sale go through. That was a very significant concession because we had absolute rights of veto over the sale, and I think that's in the record as well from the debtor's perspective. The debtor had filed a motion to dismiss, a joint motion to dismiss at the district court, in which it said that there was no way that they would have gone through the sale if they had not had the United States' consent. So this isn't just our post hoc armchair quarterback analysis of what we would have done if we hadn't had the discretion. The debtor agrees. They wouldn't have gone through the sale. They wouldn't have moved to push the sale through absent our approval. So we withdrew our objection, and the sale went through. And relying on the fact that we have this $44 million trust, relying on the fact that we have the discretion, the sale went through and we started implementing the trust. This is exactly the reason why 363M says that sales cannot be disturbed if they're not stayed, if there's a good faith purchaser. There's no dispute over whether or not Bender was a good faith purchaser. Well, strike that. The appellant did raise an argument about good faith, but that was raised for the first time at this court, so it's deemed waived. And second, we relied on the order. We allowed it to become implemented, and this trust provision is integral, and I think under the precedent of this court in the energy tech case, if a provision is integral to the sale, then it falls under the protections of 363M. Appellant even concedes that the trust was integral to the sale. It disagrees as to whether or not our discretion was integral, but as I think I explained, the discretion is integral. So I want to close with an analogy. Before you do, can you distinguish Supertrail? Sure. Supertrail was a case in which the- You haven't talked about it, has it? I'm sorry? Did you even cite Supertrail? This was cited by the- I know it's in their brief, but it would seem that that's the main theme of this whole section of their brief, and I don't think you even cite it once in your brief. Well, because we don't feel it's applicable, and here's why. Okay. Supertrail is where the judge said, look, we let the sale go through. This is purely a dispute about the proceeds. So 363M does not affect our jurisdiction to decide who owns the proceeds. This is different. This isn't a case where this is a dispute about proceeds or what happens after the sale. This is a case where Fortune is trying to disturb the fundamental reason why the sale went through, which is that we got this trust which we could use our discretion on. So absent this trust in our discretion, the sale wouldn't have happened. So this isn't a case about proceeds. This is a case about whether the sale would have gone through or whether, as in the words of Fifth Circuit, whether circumstances have changed fundamentally. They have. The leases have left the estate. But the money is still there. It could be reallocated, couldn't it? The money could be reallocated, but that would have destroyed our reliance and eviscerated the protections that 363M aims to provide because we relied on the sale and our discretion. When money is reallocated, you thought you were going to get a different share. That would happen in Superfund, too, that they thought they would get a different share, and then they're going to reallocate the money. Any time you think you're going to get a certain share. But the issue in Supertrail was— Supertrail, I'm sorry, I said Superfund. Right. The two parties were fighting over the proceeds. They both agreed the sale should have gone through. Here, we don't agree that the sale would have gone through absent our consent. But you wouldn't have really fought against the sale. We would have. We filed an objection to the sale, and we entered into week-long negotiations with the purchaser over the circumstance under which we would approve a sale. So here's a case where there was a sale, and to go back to my analogy for the first time, where we asked for a red velvet cake from the purchaser as a condition of us approving the sale. The fortune, who had nothing to do with getting the cake, not only did they want to eat the cake, they want to say, hey, let's change the red velvet cake to a hummingbird cake because that's the way we like it. Well, that's not the way it works. Standing says, you don't have standing because the cake wouldn't be there otherwise. And Mootness says, well, we already approved the sale, so you can't go back and change the flavor of the cake because you don't like the cake. That's just not how Standing and Mootness works. I thought that the better analogy is about what size of a bite you get of the cake. True. Who gets the big bite, or if everybody gets the same bite? Well, we wouldn't be getting any bites, Your Honor. We would be giving the cake to other folks, and that's the type of cake that we wanted. But, you know, ultimately this case is about things that are more important than cake. It's about how we best protect the environment, how we best address the decommissioning liabilities that were left by the ATP estate. And for the reasons that are argued, we request that the court affirm the decision of the district court. And thank you for your time. All right. Thank you, counsel, for your argument. Back to you, Mr. Rohn, for Rimbaud. Thank you. May it please the court. I just want to clear up one thing right away with regard to our position in the funds. It is Fortune's position that if the sale had not gone through and the trust was not established, there would not have been $44 million from the purchaser for us to use. No one knows what would have happened had the sale not occurred. If the sale had not occurred and the case stayed in Chapter 11 and or converted to Chapter 7, who knows what money might have been available to Fortune and other administrative claimants. So I want to make it clear that we're not conceding that there was never any money available to us. We don't know, and no one knows, because we don't know what would have happened, what the claims, if they could have been adjudicated, equitably subordinated, or what have you. There may have been some funds available to claimants like Fortune. Secondly, with regard to the government's consent power, their consent power is really limited to the sale and transfer of the good assets that went to the purchaser. Their consent power doesn't relate to the assets that stayed and where the funds that are at issue relate to. Those are all the remaining assets. Their consent power goes, they have the power to consent to the transfer of those assets that are part of the sale and go to the purchaser. That is their consent power. They used that consent power to better their economic position and alter the priority scheme because they knew they were going to be on the hook for those naked interests. Those are the ones where nobody's out there liable for it. So they used that power to make sure that they got that covered. And I will say this, they are the ones that gave ATP their operator status. So they, like Fortune, took a risk when they approved them and let them operate those oil and gas properties. They took a risk, just like Fortune did. And now they want to avoid the consequences of that and use their regulatory powers to cut a better economic deal for them. Why can't they do that? Even if it seems terribly unfair, why can't they do exactly that? Because we're in a bankruptcy, and the bankruptcy has a priority scheme and it has protections built in for creditors. But they're not a regular old creditor. They get all these special powers and privileges. They don't have the power to control the debtor's assets. And this sale, what it accomplished and what bugged the bankruptcy court was the sale proceeds are property of the estate. From the moment that sale happens, they flow into the estate. You can't escape that. They then get redirected, as the bankruptcy court says, to this trust. But for a moment in time, that is property of the estate, and their consent power does not give them power over property of the estate. But is it too late? Because that moment of time has passed. Your Honor, we feel that it's not too late. It's a simple revision of a trust agreement that allows all of the creditors to be, the similarly situated creditors, to be treated equally. We feel like the order aggrieves us, gives us standing, and we feel because of the fact that the provision regarding the discretion is not integral to the sale, it's not moot. Unless the court has any further questions. All right, sir. I think we have your argument. Thank you.